# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. 18-760 -M
One Black Samsung Galaxy S7 Edge, One Gold )
Samsung S7, and One Gray iPhone, and )
more particularly described in Attachment A )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Eastern___ District of ___Pennsylvania___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C 2251(a) | Production of child pornography |
| 18 U.S.C. 2252(a)(2) | Distribution and Receipt of child pornography |
| 18 U.S.C. 2252(a)(4)(B) | Possession of child pornography |

The application is based on these facts:

See attached Affidavit which also incorporates Attachments A and B.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Daron Schreier, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5.14.18

*Judge's signature*

City and state: Philadelphia, Pennsylvania

Honorable Timothy R. Rice, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Daron Schreier, being duly sworn, do hereby depose and state:

I.  BACKGROUND

1.  I am a Special Agent with the Federal Bureau of Investigation, and have been since January of 2006. Since August of 2006, I have been assigned to the Philadelphia Division where I have been a member of the Joint Terrorism Task Force, the Cyber squad, and most recently the Violent Crimes Against Children squad. I have received training from the FBI in the fields of international terrorism, counter-intelligence, computer crime, and the enforcement of federal child pornography laws. As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

2.  I make this affidavit in support of an application for a search warrant to search multiple cellphones (a gold Samsung S7, a black Samsung S7, and an iPhone) seized by the Philadelphia Police Department and currently in the custody of the Federal Bureau of Investigation (hereafter "TARGET DEVICES"), which have been more fully described in Attachment A of this affidavit. There is probable cause to search the devices described in Attachment A for evidence of violations of Title 18, United States Code, Sections 2251(a) [Production of Child Pornography], 2252(a)(2) [Distribution and Receipt of Child Pornography], and 2252(a)(4) [Possession of Child Pornography], further described in Attachment B. The statements contained in this affidavit are based upon my investigation, information provided by other FBI agents and Law Enforcement officers, other personnel specially trained in the seizure and analysis of computers and electronic media, and on my experience and training as a Special Agent of the FBI.

3.  Because this affidavit is being submitted for the limited purpose of securing a search warrant and it involves a minor, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. §§ 2251 and 2252 exist on the TARGET DEVICES.

II.  APPLICABLE STATUTES AND TECHNICAL TERMS

4.  Title 18, United States Code, Section 2251(a), makes it a crime to knowingly use, employ, persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct, and the depiction is produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce.

5.  Title 18, United States Code, Section 2252(a)(2)(B) makes it a crime to knowingly receive or distribute, or attempt or conspire to receive or distribute, any visual depiction, using any means or facility of interstate or foreign commerce or which has been mailed, or that has been shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been so shipped or transported, by any means including by

computer, a visual depiction of a minor engaged in sexually explicit conduct, produced using a minor engaged in such conduct.

6. Title 18, United States Code, Section 2252(a)(4)(B) makes it a crime to knowingly possess one or more matters which contain any visual depiction of a minor engaged in sexually explicit conduct, produced using a minor engaged in such conduct, that has been mailed or that has been transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or were produced using materials that were mailed or so transported, by any means including by computer.

7. Title 18 United States Code, Section 2256(2)(A) defines "sexually explicit conduct" as actual or simulated: sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or the lascivious exhibition of the genitals or pubic area of any person.

8. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records video and pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a cell phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of

        four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    9. Based on my training, experience, and research, I know that the TARGET DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and tablet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## III. COMPUTERS AND CHILD PORNOGRAPHY

    10. Computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these images on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls.

    11. The development of computers has changed this. Computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage.

    12. Child pornographers can now transfer photographic prints made from a film camera into a computer-readable format with a device known as a scanner. With the advent of digital cameras, the images can now be transferred directly from a digital camera onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally hundreds of millions of computers around the world.

    13. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last

several years. These drives can store hundreds of thousands of images at a very high resolution.

14. The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

15. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer.

16. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places on the computer (e.g., temporary files or Internet Service Provider client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the computer's web cache and history files of the browser used. A forensic examiner can often recover evidence which shows that a computer contains peer to peer software, and when the computer was sharing files. Such information may be maintained indefinitely until overwritten by other data.

17. Graphic image files containing child pornography can be maintained for long periods of time on a computer. Most often the collector maintains the files purposefully. But even when the pornographic files have been deleted (due to guilt or fear of discovery), however, computer forensic experts are nonetheless often able to recover the pornographic images that were purposefully possessed at some previous time from the computer's "unallocated" or "slack" space. In addition, pornographic images can often be recovered from the temporary Internet files, or "cache" of a computer. A forensic examiner often can recover evidence suggesting whether a computer has been used to access e-mail or chat programs, and files which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

18. As stated in paragraph 8, I know that the TARGET DEVICES work much like a tablet and personal computer. Based on my training and experience, I know that evidence of child pornography can often be found in electronic devices that function like a computer, including devices like the TARGET DEVICES.

IV. CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

19. I know based on my training and experience that most individuals who are sexually attracted to children facilitate their sexual arousal through imagery that focuses, in part

or in whole, on children. Specifically, these individuals often collect child pornography. These individuals may derive sexual gratification from actual physical contact with children as well as from fantasy involving the use of pictures or other visual depictions of children or from literature describing sexual contact with children. The overriding motivation for the collection of child pornography may be to define, fuel, and validate the collector's most cherished sexual fantasies involving children. Visual depictions may range from fully clothed depictions of children engaged in non sexual activity to nude or partially nude depictions of children engaged in sexually explicit conduct.

20. In addition to child pornography, these individuals are also highly likely to collect other paraphernalia related to their sexual interest in children. This other material is sometimes referred to as "child erotica" which is defined as any material, relating to children, that serves a sexual purpose for a given individual. It is broader and more encompassing than child pornography, but at the same time the possession of such corroborative material, depending on the context in which it is found, may be behaviorally consistent with the offender's orientation toward children and indicative of his intent. It includes things such as fantasy writings, letters, diaries, drawings, cartoons and non-sexually explicit visual images of children.

21. Child pornography collectors reinforce their fantasies, often by taking progressive, overt steps aimed at turning the fantasy into reality in some or all of the following ways: collecting and organizing their child related material; masturbating while viewing the child pornography; engaging children, online and elsewhere, in conversations, sometimes sexually explicit conversations, to fuel and fortify the fantasy; interacting, both directly and indirectly, with other likeminded adults through membership in organizations catering to their sexual preference for children thereby providing a sense of acceptance and validation within a community; gravitating to employment, activities and/or relationships which provide access or proximity to children; and frequently persisting in the criminal conduct even when they have reason to believe the conduct has come to the attention of law enforcement. These are need-driven behaviors to which the offender is willing to devote considerable time, money, and energy in spite of risks and contrary to self-interest.

22. Persons with a sexual interest in children often maintain and possess their material in the privacy and security of their homes or some other secure location, such as a private office or work computer, where it is readily available. The collection may include sexually explicit or suggestive materials involving children, such as photographs, magazines, narratives, motion pictures, video tapes, books, slides, drawings, computer images, computer videos, or other visual media. Because they put so much time and energy into obtaining the material, they do not delete or destroy their collections.

V. PROBABLE CAUSE

23. On April 4, 2018, the mother of an 11-year old female (hereafter "MINOR #1), both of whose identities are known to your Affiant, reported to the Philadelphia Police Department how the mother found an image in a deleted folder on MINOR 1's phone depicting MINOR #1 in panties with her breasts exposed. When the mother confronted MINOR #1, MINOR #1 disclosed that she was sending the image to ISHMAEL GONZALEZ (DOB:

09/25/1989). MINOR #1 also told her that GONZALEZ has been touching MINOR #1 since 2015, to include her breasts, between her legs, and her butt. MINOR #1's phone was identified as a **gray iPhone 6s**.

24. The mother further reported that in 2017, a relative of MINOR #1 (whose identity is known to your affiant) had observed an incident where GONZALEZ was looking at MINOR #1's vagina. GONZALEZ told the relative not to tell anyone about this incident. The mother also reported that in 2015, a different relative (whose identity is known to your affiant) caught MINOR #1 using a vibrator. When the mother later confronted MINOR #1, MINOR #1 said that GONZALEZ told her she could use the vibrator.

25. On April 4, 2018, MINOR #1 was interviewed at the Philadelphia Children's Alliance by a Child/Adolescent Forensic Interviewer, which was audio and video recorded. During this interview, she disclosed the following: MINOR #1 took the picture of her exposed breasts on April 3, 2018, at the direction of GONZALEZ. She then sent them to GONZALEZ's Instagram account via direct message using MINOR #1's phone. MINOR #1 started taking naked pictures for GONZALEZ when she was 8 years old, and this has included naked pictures of her vagina. GONZALEZ told MINOR #1 that he posted the naked pictures of MINOR #1 on Instagram in accounts under her name, and MINOR #1 believed that GONZALEZ was getting paid by others to post the pictures. As a reward for taking pictures, GONZALEZ promised to put the money he earned towards a cellphone for MINOR #1. Approximately one month ago, GONZALEZ purchased MINOR #1 an iPhone, which is the cellphone described in paragraph 23. Prior to having the iPhone, MINOR #1 took naked pictures for GONZALEZ on GONZALEZ's cellphone. MINOR #1 further disclosed that GONZALEZ has been sexually molesting her for several years, to include touching her naked vagina and an incident when she was 9 years old when GONZALEZ had MINOR #1 perform oral sex on him.

26. On April 4, 2018, Philadelphia Police arrested GONZALEZ for Rape, in violation of Title 18, Pa. C.S.A., Section 3121, and other offenses relating to the sexual abuse and exploitation of MINOR #1. After being advised of his constitutional rights, GONZALEZ waived his rights and agreed to speak with interviewing Detectives. During the interview, which was audio and video recorded, GONZALEZ provided the following information: GONZALEZ admitted to taking naked pictures of MINOR #1 on 5 to 6 occasions which included naked images of her vagina, breasts, and butt. In one of these images, GONZALEZ described MINOR #1 as laying on her back in bed with her legs in the air and her vagina visible. GONZALEZ used his hand to spread open her vagina while this picture was taken. It has been awhile since GONZALEZ took pictures himself, but it was common practice for MINOR #1 to take naked pictures and send them to GONZALEZ. After MINOR #1 took a picture, she would show it to GONZALEZ and then he would electronically send the picture to himself using a Bluetooth. The picture the mother found on MINOR #1's phone was supposed to have been sent to GONZALEZ, and GONZALEZ had asked MINOR #1 to take the picture. He did not specify which devices he or MINOR #1 used to take the photographs discussed in this paragraph.

27. GONZALEZ posted the naked images of MINOR #1 to Instagram, stating he did so for the excitement and that "my wife wasn't doing it, so I took advantage of [Minor #1]." GONZALEZ advised that he posted these images to multiple Instagram accounts because the accounts he used kept on getting shut down. GONZALEZ further confessed that he used his

current cellphone, **a black Samsung S7**, and two previous cellphones to upload the naked pictures to Instagram. One of the previous cellphones, which he identified as a **gold Samsung S7**, has a broken screen and at the time of the interview, was in his house at 918 S. Cecil Street, Philadelphia, PA. He stated that the other cellphone was returned to T-Mobile. GONZALEZ further advised that there will also be naked pictures of MINOR #1 on her iPhone.

28. GONZALEZ admitted to kissing and rubbing MINOR #1's breasts and neck. He denied penetrating her vagina with his finger, but admitted to touching her in that area. In the spring or summer of 2017, GONZALEZ asked MINOR #1 to put his penis in her mouth. MINOR #1 did not want to do it, but GONZALEZ kept asking until she finally agreed to do it.

29. At the time of his arrest, GONZALEZ had in his possession a black Samsung Galaxy S7 edge, IMEI: 357219070509315. The cellphone was seized at the time of his arrest by the Philadelphia Police Department and subsequently turned over to the FBI on April 11, 2018. Philadelphia Police did not search the contents of the cellphone.

30. On the morning of April 5, 2018, Philadelphia Police executed Commonwealth of Pennsylvania Search Warrant 210051 at the shared residence of GONZALEZ and his wife, which was identified as 918 S. Cecil Street, Philadelphia PA, 19143. During the execution of the search warrant, Philadelphia Police found and seized a gold Samsung Galaxy S7 Edge with a broken screen, IMEI: 356164073580429. Philadelphia Police did not search the contents of the cellphone. The cellphone was subsequently turned over to the FBI on April 11, 2018.

31. On April 4, 2018, the mother of MINOR #1 voluntarily turned over a gray iPhone, Model A1633, which she identified as the cellphone used by MINOR #1. Philadelphia Police did not search the contents of the cellphone. The cellphone was subsequently turned over to the FBI on April 11, 2018.

## VI. SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

32. Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

   a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of millions of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order and/or with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

   b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password protected, or encrypted files. Because computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

## VII. SEARCH METHODOLOGY TO BE EMPLOYED

33. To search for electronic data contained in computer hardware, computer software, and/or memory storage devices, the examiners will make every effort to use computer forensic software to have a computer search the digital storage media. This may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

   a. Searching for image files to locate images of children engaging in sexually explicit conduct or child erotica, examining log files associated with the receipt, transmission, and viewing of such images, examining metadata of such images, and examining all of the data contained in such computer hardware, computer software, and /or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth in the search warrant;

   b. Surveying various file directories and the individual files they contain;

c. Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in the warrant (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

d. Opening files in order to determine their contents;

e. Scanning storage areas;

f. Searching for malware (computer code not intended by the user) in order to, if necessary, rebut a defense that malware caused the receipt, possession or distribution of child pornography;

g. Performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

h. Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## VIII. CONCLUSION

34. Based on the aforementioned factual information, your Affiant respectfully submits that there is probable cause to believe that on the TARGET DEVICES, further described in Attachment A, there will be located evidence, contraband, and fruits and instrumentalities of violations of 18 U.S.C. §§ 2251(a), 2252(a)(2), and 2252(a)(4), as further described in Attachment B.

Daron Schreier
Special Agent
Federal Bureau of Investigation

Sworn to me this 14 day of May 2018.

HONORABLE TIMOTHY R. RICE
United States Magistrate Judge

## ATTACHMENT A
## DESCRIPTION OF LOCATION TO BE SEARCHED
(Target Devices)

Electronic devices, originally seized by the Philadelphia Police Department, and currently maintained in the custody of the Federal Bureau of Investigation in Philadelphia, Pennsylvania, further described as

- Black Samsung Galaxy S7 Edge, IMEI: 357219070509315
- Gold Samsung Galaxy S7 Edge with a broken screen, IMEI: 356164073580429
- Gray iPhone, Model A1633

# ATTACHMENT B
# ITEMS TO BE SEIZED

The following items may be searched for and seized: Evidence of violations of 18 U.S.C. §§ 2251(a), 2252(a)(2), and 2252 (a)(4), including:

1. All visual depictions of minors engaged in sexually explicit conduct (as defined in 18 U.S.C. § 2256) produced using minors engaged in such conduct, on the Target Devices, including those in opened or unopened e-mails and chat conversations.

2. All documents, including correspondence, records, opened or unopened e-mails, chat logs, and internet history, pertaining to the possession, receipt, access to or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256, or pertaining to an interest in child pornography whether transmitted or received, or which tends to show the knowing possession of any child pornography possessed, or which involves communications with minors in efforts to encourage the minors to engage in sexually explicit conduct.

3. All documents, including correspondence, records, opened or unopened e-mails, chat logs, and internet history that pertains to the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission in or affecting interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

4. All documents, including correspondence, records, opened or unopened e-mails, chat logs, and internet history which evidence operation or ownership or use of the Target Device, including, but not limited to, correspondence, sales receipts, bills for internet access, financial records, tax records, personal photographs, telephone records, notes books, diaries, reference materials, or other personal items, and registration information for any software on the computer.

5. All passwords, keywords and other data security devices designed to restrict access to or hide computer software, documentation or data on the Target Device. Data security devices may consist of hardware, software, or other programming code. Any password or encryption key that may control access to the operating system, individual electronic files, or other electronic data.

6. Evidence and contents of logs and files on a computer or storage device, such as those generated by the computer's operating system, which describes the history and use of the device, including but not limited to files indicating when files were written, were opened, were saved, or were deleted. Evidence tending to show the identity of the person using the computer at the time any visual depictions or communications described in paragraphs 1-2 were created, sent, received, or viewed. Also, any malware resident on the Target Device.